## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| **AUSTIN WILLIAMS,** *et al.*, | : | |
| | : | |
| **Plaintiffs,** | : | **Case No. 2:22-cv-01831** |
| | : | |
| **v.** | : | **Chief Judge Algenon L. Marbley** |
| | : | **Magistrate Judge Kimberly A. Jolson** |
| | : | |
| **THE CITY OF COLUMBUS,** *et al.*, | : | |
| | : | |
| **Defendants.** | : | |

## OPINION & ORDER

These matters are before the Court on Defendants' Motion for Summary Judgment (ECF No. 37) and objections to certain findings within Plaintiffs' expert's report (ECF No. 51 at PageID 980-982). For the reasons set forth below, Defendants' Motion for Summary Judgment is **GRANTED IN PART and DENIED IN PART** and Defendants' objections to certain findings within Plaintiffs' expert's report are **SUSTAINED**.

## I.    BACKGROUND

### A.  Factual Background

This case involves an encounter between Plaintiffs and Columbus Police Department ("CPD") officers at the George Floyd protests.[1] Plaintiffs are couple Alexandra Davis and Austin Williams.[2] (ECF No. 1 ¶ 13). Defendants are the City of Columbus, former CPD Chief of Police Thomas Quinlan, CPD Officer Davis,[3] and CPD officers or mutual-aid law enforcement personnel

---

[1] This case is related to *Alsaada, et al. v. The City of Columbus, et al.*, Case No. 20-cv-03431 (S.D. Ohio), which settled on December 29, 2021. (*See Alsaada*, ECF No. 86). Plaintiffs incorporate the *Alsaada* complaint into their complaint in this case. (*See* ECF No. 1 ¶ 1, PageID 10-90). The *Alsaada* complaint discusses CPD's response to the George Floyd protests, as well as the training of its police officers.
[2] As discussed below, Plaintiff Austin Williams' claims were later voluntarily dismissed from this case.
[3] The first name of Officer Davis is unknown.

John and Jane Doe Nos. 1-15. (*Id*. ¶¶ 9-12).

The killing of George Floyd was detailed by this Court in *Alsaada v. City of Columbus*.

Specifically, this Court recounted the following:

> On May 25, 2020, George Floyd, a Black American, presented a counterfeit $25 bill at a convenience store. Police arrived. Moments later, Mr. Floyd showed no signs of life. After Officer Derek Chauvin kneeled on Mr. Floyd's neck for approximately nine minutes and 29 seconds, Mr. Floyd died. "I can't breathe" – a cry for help gasped by an incalculable number of American dying at the hands of government officials, including Mr. Floyd – became an international rallying cry.

> Days after the killing, protests began across the nation, and Columbus, Ohio was no exception. Most of the demonstrations occurred between May 28 and June 21, 2020, with further protests on either end of the period in response to deaths of other Americans at the hands of law enforcement.

536 F. Supp. 3d 216, 229 (S.D. Ohio 2021).

On June 29, 2020, Plaintiffs were in downtown Columbus with friends, with no intention of protesting. (ECF No. 1 ¶ 13; ECF No. 35-1 at PageID 592-593). While downtown, Plaintiffs witnessed a citizen have a medical emergency and waited for an ambulance to arrive. (ECF No. 1 ¶ 13). After the ambulance took the citizen to the hospital, Plaintiffs decided to join in the George Floyd protests that were happening downtown. (*Id*. ¶ 14). Plaintiffs had previously participated in the protests. (ECF No. 36-1 at PageID 691; ECF No. 35-1 at PageID 590-591). During the June 29, 2020 protests, CPD officers instructed protestors, including Plaintiffs, to remain on the sidewalk and to not enter the street. (*Id*. ¶ 15). Defendants claim there were around one hundred to two hundred protestors out that night. (ECF No. 34-1 at PageID 463). Plaintiffs and their friends were on the corner of Broad Street and High Street. (ECF No. 1 ¶ 13). Plaintiff Davis asked an officer if she could cross the street and sit on the steps on the southwest corner of Broad Street and High Street, to which the officer responded she could not cross the street. (*Id*. ¶ 16).

Because of a life-long habit she has, Plaintiff Davis was undisputedly spitting repeatedly that evening and officers gave her several verbal commands to stop spitting and warned her if she did not stop, she would be arrested. (ECF No. 37 at PageID 790; ECF No. 34-1 at PageID 460, 464, 467, 470; ECF No. 32-1 at PageID 268; ECF No. 35-1 at PageID 625-626). According to Plaintiff Davis, she has had a "bad habit" of spitting ever since she was a child and smoking cigarettes exacerbates the problem because she collects a lot of saliva in her mouth and regularly has to spit. (ECF No. 35-1 at PageID 625, 628). In fact, she said she is "always spitting," and the night of the incident, "[e]verybody probably noticed [her] spitting." (*Id*. at PageID 626). Defendants allege an officer told his sergeant that if Plaintiff Davis spit on him, he was going to arrest her, to which the sergeant responded "okay." (ECF No. 34-1 at PageID 460).

After Plaintiff Davis was told she could not cross the street, she sat down on the sidewalk, in front of officers, near the curb, with her feet in the street. (ECF No. 1 ¶ 17; ECF No. 35-1 at PageID 598-599). While seated, Plaintiff Davis kept spitting and at one point she spit in the direction of an officer. (ECF No. 37 at PageID 791; ECF No. 34-1 at 471). Defendants allege Plaintiff Davis' spit made contact with the officer's boot. (ECF No. 37 at PageID 791; ECF No. 34-1 at PageID 471). Plaintiff Davis, however, asserts she did not spit on the officer; rather, she spit on the ground in-between her legs. (ECF No. 47 at PageID 952; ECF No. 35-1 at PageID 601-602, 626).

Nevertheless, Plaintiff Davis claims the officer confronted her about spitting on his boot, to which Plaintiff Davis responded that she did not spit on his boot and that she had the incident on her phone since she was live streaming the protest. (ECF No. 1 ¶ 16; ECF No. 35-1 at PageID 601-602, 638). Defendants claim the officer then approached Plaintiff Davis and told her she was under arrest and to stand up so he could detain her. (ECF No. 37 at PageID 791; ECF No. 34-1 at

PageID 468-469). According to Defendants, Plaintiff Davis refused to stand up, so the officer took hold of Plaintiff Davis' wrist to assist her in getting off the sidewalk, but she used her "dead weight" to bear down and resist standing up to be placed in handcuffs. (ECF No. 37 at PageID 791; ECF No. 34-1 at PageID 469, 477). Defendants allege two officers then attempted to remove Plaintiff Davis from the sidewalk and into the street in order to execute her arrest safely, but she continued to resist arrest by pulling her arms away from the officers and kicking at them. (ECF No. 37 at PageID 791; ECF No. 34-1 at PageID 478). An officer described the situation as "chaotic." (ECF No. 34-1 at PageID 479).[4]

Plaintiff Davis' recollection of the incident differs from Defendants' version. Plaintiff Davis claims an officer grabbed her neck while she was sitting on the sidewalk with her head down and then proceeded to drag her into the street. (ECF No. 1 ¶ 17; ECF No. 35-1 at PageID 615-616, 637). She claims she was not told she was under arrest until officers had their hands on her. (ECF No. 35-1 at PageID 616). Plaintiff Davis described being "attacked" and "jumped by grown men." (*Id*. at PageID 631). She stated she felt officers' knees in her back, hands on her neck and ankle, and yanks to her arm. (*Id*. at PageID 615). Plaintiff Davis claims she was yelling to the officers that they were hurting her, she was in pain, she could not breathe, her ankle hurt, and to get off of her, but the officers ignored her cries of pain and discomfort. (ECF No. 1 ¶¶ 20, 21; ECF No. 35-1 at PageID 615).

While in the street, the officers handcuffed Plaintiff Davis and ordered her to stand up and walk to the police van, but she told the officers she could not walk because she has metal in her ankle,[5] they hurt her ankle, and her ankle was swollen. (ECF No. 35-1 at PageID 615, 640; ECF

---

[4] During the prosecution of this case, Officer Hall was identified as arresting Plaintiff Davis with Officer Bishop's assistance. (*See* ECF Nos. 34-1 and 32-1).
[5] Plaintiff Davis broke her ankle a few years prior to this incident. (ECF No. 35-1 at PageID 567, 610).

No. 1 ¶ 21). Allegedly, officers ignored her concerns and demanded she walk anyway. (ECF No. 1 ¶ 21). According to Plaintiff Davis, her ankle buckled and officers proceeded to drag her to the police van, without her flip flops on, with her ankles dragging on the street. (ECF No. 35-1 at PageID 616-617, 640-641; ECF No. 1 ¶ 21).

While Plaintiff Davis was being dragged into the street by officers, Plaintiff Williams approached the scene to try to figure out what was going on. (*Id*. ¶ 19). Defendants claim Plaintiff Williams swung an arm out, attempted to intervene in Plaintiff Davis' arrest, grabbed an officer, and charged at an officer. (ECF No. 37 at PageID 792). Defendants responded by taking Plaintiff Williams to the ground utilizing a "level 1"[6] modified hip toss. (*Id*.). Plaintiff Williams, however, claims an officer body-slammed him onto the ground, rolled him over, and maced him after he had already been detained. (ECF No. 1 ¶ 19; ECF No. 36-1 at PageID 714).[7]

Returning to Plaintiff Davis, she claims she had a panic attack while she was in the police van, to which officers allegedly did not respond. (ECF No. 1 ¶ 22). Plaintiff Davis claims to have then "passed out" and woke up subsequently at the police station. (*Id*. ¶ 23). While at the police station, Plaintiff Davis had another panic attack and was evaluated by a medic. (*Id*.).

Plaintiff Davis claims to have suffered physical and emotional injuries as a result of this incident. Specifically, she claims she had bruising all over her body. (ECF No. 35-1 at PageID 624).[8] Additionally, she claims she has continuing problems with her ankle, knee, and back, as

---

[6] There are eight levels of force CPD uses. Level 0 is officer presence, verbal, and non-verbal commands, searching, handcuffing, sparking a taser for compliance, and use of flashbangs and multiple baton rounds as diversions; Level 1 is empty hand control, pressure points, grounding techniques, and joint manipulations; Level 2 is chemical spray; Level 3 is electronic device, such as a taser; Level 4 is "hard empty hand control," such as strikes, punches, and kicks; Level 5 is use of an impact weapon, such as baton or flashlight; Level 6 is a police K-9 bite; Level 7 is less-lethal weapons, such as beanbags or multiple baton rounds; and Level 8 is deadly force. (ECF No. 37-4 at PageID 834).

[7] During the prosecution of this case, Officer Davis was identified as the officer who arrested Plaintiff Williams. (*See* ECF No. 33-1).

[8] Plaintiff Davis claims she took pictures of her bruises, but she can no longer find them. (ECF No. 34-1 at PageID 624). No pictures have otherwise been produced in this case.

well as problems with headaches, blood pressure, and anxiety. (*Id*. at PageID 611, 619-623). While she admits she had problems with those parts of her body before this incident, she claims they were exacerbated by the incident. (*Id*.).[9] Specifically with her ankle, she said after the incident it feels like something is stabbing her when she walks. (*Id*. at PageID 567, 620). She, however, has not seen a doctor for her ankle injury because she does not want doctors to have to re-break it again. (*Id*. at PageID 619).

<u>Videos</u>

Defendants submitted a flash drive to this Court containing various video footage from the incident. (ECF Nos. 31, 39). Specifically, the flash drive contains four videos of officer body camera footage and two videos taken on cell phones. As discussed below, Plaintiff Williams dismissed his claims in this case. Accordingly, this Court will only describe what the Court sees and hears in the videos regarding Plaintiff Davis' claims.

1. *Video 1*

The video titled "A. Davis Depo Ex. 2 – Roger BWC" is 27 minutes and 15 seconds long. From 0:00 to 1:00, there is no audio and the only visual footage is of officers standing in a huddle. From 1:00 to 3:54, the footage shows officers forming a horizontal straight line and walking down the street. The footage then goes black from 3:54-6:11 and only contains audio of the protests. From 6:11-7:48, this Court can see there is some kind of interaction between a woman (presumably Plaintiff Davis) and officers. The Court, however, cannot hear anything that is being said and cannot make out any details of the interaction since the officer with the body camera is across the street and his hand is blocking much of the footage.

---

[9] In terms of emotional trauma, in addition to anxiety, Plaintiff Davis claims every time she sees a police officer she gets nervous, she has flashbacks to the incident, she "freak[s] out" if anybody touches her, and she no longer calls the police even if there is something wrong. (ECF No. 35-1 at PageID 623-624, 628-629).

At 7:48, this Court can see Plaintiff Davis sit down on the sidewalk with her feet in the street. The Court next sees Plaintiff rock forward several times. Around 7:57, this Court can see exhalation, but Plaintiff Davis is too far away in the video for this Court to see whether she in fact spit and, if so, where. Regardless, the Court then sees one officer approach Plaintiff Davis and then two officers start to drag Plaintiff Davis into the street. The officer with the body camera then runs towards Plaintiff Davis and the other officers. This Court can hear someone (presumably Plaintiff Davis) yelling "owe, owe, get off of me, get off of me." The footage then shows Plaintiff Davis being handcuffed and detained. Plaintiff Davis is yelling repeatedly to someone to get her phone and to the officers to get off of her. The rest of the video footage is not relevant to this motion.

## 2. *Video 2*

The video titled "MSJ Ex. 1 – Cell Phone Video 5" is 1 minute and 53 seconds long. This Court cannot see any of the confrontation between Plaintiff Davis and officers in the video. Starting around 0:08, however, this Court can hear a woman (presumably Plaintiff Davis) repeatedly yelling "get off of me" and "owe." The Court can also hear officers say, "you're under arrest," "stop resisting," and "put your hands behind your back," to which the woman responds, "I can't if I'm on it." The woman then continues to yell "get off of me" and repeatedly yells for someone to get her phone, saying "it's all online."

## 3. *Video 3*

The video titled "MSJ Ex. 2 – Hostettler BWC 1" is 43 minutes and 56 seconds long. The video is footage of Plaintiff Davis detained in the back of the police van parked in a parking garage. There is no audio until 1:00. From 1:00-3:38, this Court can see and hear Plaintiff Davis sitting in the back of a police van, with her hands handcuffed behind her back, talking to officers. Around 3:38, she starts crying and asks questions about whether she will be able to see her daughter and

why she is being arrested. She then starts breathing at a rapid pace and lays down in the back of the police van. An officer then begins to photograph her[10] while another officer tries to calm her down.

At 18:02, detectives approach the police van to interview Plaintiff Davis. They read her *Miranda* rights and she waives her rights. She then tells detectives that she asked officers if she could cross the cross-walk and she was told no, so she proceeded to sit on the sidewalk with her legs crossed. She avers she had built up mucus, and admits she was spitting. She states she spit *towards* an officer and he said "don't do that again or I will arrest you," to which she responded, "yes sir, I understand, that's assault with a deadly weapon, I'm not about to get charged with nothing." She said she then moved beside the officer, leaned away, and spit to her side because she still had mucus she needed to get out. She claims the officer then said, "you're under arrest," to which she responded, "sir, for what?" Plaintiff Davis said the officer then grabbed her by her arm and she said, "okay sir, please get off of me, I have PTSD, I will put my hands behind my back." She said she then had six officers around her with someone on her back and she started to "freak out." She said the officer told her she spit on him, to which she responded she did not spit *on* him, she spit *besides* him.

The detectives then tell Plaintiff Davis there is a video of her spitting on the officer, to which she responds that cannot be true because she did not spit on the officer. She then said she knows spitting is "assault with a deadly weapon" and she would never do that because she has a four-year-old daughter at home and thinks the police are corrupt. She then invoked her right against self-incrimination and requested a lawyer, and the interview ended at 22:33. The rest of the video is not relevant to this motion.

---

[10] This Court is not in receipt of any photographs taken of Plaintiff Davis.

4. *Video 4*

The video titled "MSJ Ex. 3 – Hostettler BWC 2" is 1 hour, 4 minutes, and 50 seconds long. There is no audio until 1:00. At 1:00, an officer approaches Plaintiff Davis, who is still sitting in the back of the police van in the garage, handcuffed behind her back. The officer then takes Plaintiff Davis by foot to be processed into the jail. Plaintiff Davis told the officer she has a limp and she appears to be in pain as she is walking. Nevertheless, she was processed and brought back to the police van in the garage.

Around 51:25, while Plaintiff Davis was sitting in the police van in the garage still handcuffed, she began to tell an officer what happened. Specifically, she said there were eight people in her group at the time of the incident and they were not with any other protesters. She then told the officer they called paramedics for a woman they did not know who was having seizures. Next, she said people started blocking off the street, including her, until she saw the police, and then she told her group to get out of the street, which they did. She then said she asked an officer if she could cross the cross-walk to get to the other side where her other friends were. She said she was told no, so she then sat on the sidewalk with her legs crossed.

Plaintiff Davis then admits she spit in the officer's direction, but said it was not purposefully towards him. She said the officer said, "don't spit *in the street* or I'll arrest you," and not "don't spit on *me*," to which she responded, "you can't arrest me for spitting on the street." She said she was spitting between her legs as she was sitting on the sidewalk and was not spitting at the officer. She recognized she was being "hard-headed," but she maintained that she did not spit on the officer because she knows that is "assault with a deadly weapon."

5. *Video 5*

The video titled "Williams Depo Ex. 5 – Grice BWC" is 31 minutes and 48 seconds long.

At 7:50, the officer's body camera shifts to the incident. This Court can see an officer dragging a woman (presumably Plaintiff Davis) from the sidewalk into the street. The footage does not show Plaintiffs Davis being arrested, but this Court can hear officers saying "stop resisting" and "put your hands behind your back." The Court, though, is unsure whether those commands were directed towards Plaintiff Davis or Plaintiff Williams. Around 9:48, this Court sees Plaintiff Davis being escorted to the police van. She is repeatedly yelling "get off of me" and "you're hurting me." The rest of the video is not relevant to this motion.

### 6. *Video 6*

The video titled "Williams Depo Ex. 6 – Cell Phone Video 1" is 19 seconds long. The video is extremely grainy/pixilated even when the Court makes the frame smaller. This Court can only make out a person (presumably Plaintiff Davis) being dragged into the street from the sidewalk. Plaintiff Davis appears to be wearing a dress with her bare legs exposed. Plaintiff Davis' buttocks are on the ground while officers appear to be dragging her by her arms. At one point, Plaintiff Davis appears to lean back away from officers and bounce her back off the ground. This Court can hear Plaintiff Davis repeatedly yelling to the officers to get off of her.

### B. Procedural History

Plaintiff Davis was ultimately charged with Harassment with Bodily Substance, in violation of Ohio Revised Code § 2921.38(B),[11] and Resisting Arrest, in violation of Ohio Revised Code § 2921.33(A). (ECF No. 37-1). The charges, however, were either not filed, dropped, or otherwise dismissed. (ECF No. 35-1 at PageID 631-634).[12] Plaintiff Williams was charged with

---

[11] Ohio Revised Code § 2921.38(B) states: "No person, with intent to harass, annoy, threaten, or alarm law enforcement officer, shall cause or attempt to cause the law enforcement officer to come into contact with blood, semen, urine, feces, or another bodily substance by throwing the bodily substance at the law enforcement officer, by compelling the bodily substance upon the law enforcement officer, or in any other manner."

[12] During oral argument, counsel for Defendants stated Plaintiff Davis' charges "vanished" and she did not know what happened.

Resisting Arrest, specifically, trying to grab and pull Plaintiff Davis away from officers who were placing her under arrest. (ECF No. 1 ¶ 27). The charge against him, however, was subsequently dismissed by the prosecutor. (*Id*. ¶ 28; ECF No. 36-1 at PageID 734).

On March 30, 2022, Plaintiffs filed their complaint in this case. (ECF No. 1). Plaintiffs allege the following: (1) excessive force in violation of the Fourth and Fourteenth Amendments (against all Defendants); (2) a violation of the First and Fourteenth Amendment right to assemble and exercise freedom of expression (against all Defendants); (3) gross negligence (against all Defendants); (4) battery (against Defendants Quinlan, Davis, and John and Jane Does Nos. 1-15); (5) and malicious prosecution of Plaintiff Williams (against Defendant Davis). (*Id*. ¶¶ 32-43). On May 25, 2022, Defendants answered Plaintiffs' complaint, denying the allegations. (ECF No. 10).

On May 1, 2023, Defendants filed their motion for summary judgment. (ECF No. 37). On June 8, 2023, Plaintiffs responded in opposition to Defendants' motion for summary judgment. (ECF No. 47). On June 14, 2023, the parties filed a Stipulation of Dismissal of Plaintiff Williams' claims and all claims against Defendant Officer Davis. (ECF No. 48). On June 29, 2023, Defendants replied to Plaintiffs' response in opposition to Defendants' motion for summary judgment. (ECF No. 51). Within their reply, Defendants objected to several findings within Plaintiff's expert's report. (*Id*. at PageID 980-982). On December 18, 2023, this Court heard oral argument on Defendants' motion for summary judgment. The issues are now ripe for this Court's consideration.

## II.    STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Maben v. Thelen*, 887 F.3d 252, 258 (6th Cir. 2018). The court's function at the summary

judgment stage is "not [] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The court thus asks "whether 'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Patton v. Bearden,* 8 F.3d 343, 346 (6th Cir. 1993) (quoting *Anderson*, 477 U.S. at 251-52). Ultimately, "summary judgment will not lie if the dispute is about a material fact that is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248. Said differently, "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 250. Evidence that is "merely colorable" or "not significantly probative," however, is not enough to defeat summary judgment. *Id*. at 249-50

The party seeking summary judgment carries the initial burden of presenting the court with law and argument in support of its motion, as well as identifying the relevant portions of "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56). If this initial burden is satisfied, then the burden shifts to the nonmoving party to set forth specific facts showing that there is a genuine issue for trial. *See* Fed. R. Civ. P. 56(e); *see also Anderson,* 477 U.S. at 250.

Importantly, at the summary judgment stage, the court must "view[] factual evidence in the light most favorable to the non-moving party and draw[] all reasonable inferences in that party's favor." *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 511 (6th Cir. 2009). Accordingly, at this stage in the litigation, the court must accept the plaintiff's version of events without weighing the evidence or assessing the credibility of prospective witnesses. *Cordell v. McKinney*, 759 F.3d 573,

578 (6th Cir. 2014). But, "[t]he mere existence of a scintilla of evidence to support [the non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995) (citing *Anderson*, 477 U.S. at 252).

## III. LAW & ANALYSIS

### A. Objections to Certain Findings in Plaintiffs' Expert's Report

Prior to reaching the substantive arguments raised in Defendants' motion for summary judgment, this Court will first address Defendants' objections to certain findings within Plaintiffs' expert's report. *See Brainard v. American Skandia Life Assur. Corp*., 432 F.3d 655, 657 (6th Cir. 2005) ("Generally, a district court should dispose of motions that affect the record on summary judgment before ruling on the parties' summary judgment motions."). Rule 56 of the Federal Rules of Civil Procedure governs the procedure by which courts must review objections to the admissibility of evidence presented in connection with a motion for summary judgment. *See generally* Fed. R. Civ. P. 56. To start, a party making or opposing summary judgment must cite to materials in the record including "depositions, documents, electronically stores information, affidavits or declarations, stipulations, (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). If a party believes that such materials "cannot be presented in a form that would be admissible in evidence," that party may file an objection. Fed. R. Civ. P. 56(c)(2).

The court may only consider admissible evidence in ruling on a motion for summary judgment. *Wiley v. United States*, 30 F.3d 222, 226 (6th Cir. 1994). As such, an objection pursuant to Rule 56(c)(2) functions much as an objection at trial, but it is adjusted for the pretrial setting. Fed. R. Civ. P. Adv. Comm. Notes (2010 Amendments). The objection, however, is "not that the

material 'has not' been submitted in admissible form, but that it 'cannot' be." *B&S Transp., Inc. v. Bridgestone Ams. Tire Operations, LLC*, No. 5:13-cv-2793, 2016 WL 1089394, at *13 (N.D. Ohio Mar. 21, 2016) (quoting *ForeWord Magazine, Inc.*, 2011 WL 5169384, at *2). The court may, therefore, allow the proponent an opportunity to properly support or address the fact, or "propose a method for doing so at trial." *See ForeWord Magazine, Inc.*, 2011 WL 5169384 at *6; Fed. R. Civ. P. 56(e).

Overall, it is opponent's burden to identify specifically what in the document should be excluded. *Wilson*, 762 F. Supp. 2d at 1057. Then, it is the proponent's burden to show that the material is admissible as presented or to explain the admissible form that it anticipates. Fed. R. Civ. P. 56(c)(2) (2010 Advisory Committee Notes). If the court determines portions of evidence are inadmissible, the court must only exclude the inadmissible portions, rather than the whole document. *Wilson v. Budco*, 762 F. Supp. 2d 1047, 1057 (E.D. Mich. 2011).

In this case, Defendants object to certain findings made by Plaintiffs' expert, Mr. Michael Gerard. The admissibility of expert testimony is governed by Rule 702 of the Federal Rules of Evidence, which provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Opinion testimony is "not objectionable just because it embraces an ultimate issue." Fed. R. Evid. 704. Though "testimony offering nothing more than a legal conclusion—i.e, testimony that does little more than tell the jury what result to reach—is properly excludable under the Rules." *Woods v. Lecureux*, 110 F.3d 1215, 1220 (6th Cir. 1997). Indeed, "unnecessary expert testimony may be excluded." *Hubbard v. Gross*, 199 Fed. App'x 433, 442 (6th Cir. 2006) (citing *Salem v. United States Lines Co.*, 370 U.S. 31, 35 (1962)).

In the context of claims against the police, experts are routinely permitted to "testify about discrete police-practice issues when those experts are properly credentialed and their testimony assists the trier of fact." *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 908 (6th Cir. 2004). What experts may not do, however, "is take the additional step to conclude that actions were or were not reasonable, appropriate, or in line with police standards." *Crabbs v. Pitts*, No. 2:16-cv-0387, 2019 WL 5262397, at *6 (S.D. Ohio Oct. 23, 2018) (citing *Alvarado v. Oakland Cnty.*, 809 F. Supp. 2d 680, 690-91 (E.D. Mich. 2011)). The Court acknowledges that "[i]t is a fine line between an expert who permissibly opines on an ultimate issue and one who impermissibly tells the jury what result to reach or expresses a legal conclusion." *Id*. Though "when an expert's opinion amounts to defining legal terms and opining whether certain conduct violated or was consistent with those legal terms, it is inadmissible." *Dudas v. Engel*, No. 1:19-cv-2565, 2021 WL 2000579, at *5 (N.D. Ohio May 17, 2021) (citing *Berry v. City of Detroit*, 25 F.3d 1342, 1353 (6th Cir. 1994)). Such inadmissible statements or opines include "it was objectively unreasonable for [an officer] to shoot [the plaintiff]," *DeMerrell v. City of Cheboygan*, 206 Fed. App'x 418, 426 (6th Cir. 2006), and "whether the officers used reasonable force," *Hubbard*, 199 Fed. App'x at 443. *See also Garrit v. City of Chicago*, No. 16-cv-7319, 2022 WL 124554, at *2-6 (N.D. Ill. Jan. 13, 2022) (holding that an expert may testify regarding how nationally accepted practices apply to

hypotheticals supported by the evidence, but may not testify whether the officers' conduct was consistent with the Chicago Police Department's use of force policies); *King v. Mason*, No. 2:18-cv-1060, 2023 WL 183957, at *10 (S.D. Ohio Jan. 13, 2023) (holding that an expert may testify to policies and procedures and to the nationally recognized police standards that govern excessive force, but may not testify as to objective reasonableness and legal conclusions).

Here, Defendants object to the first, second, and fourth findings made by Mr. Gerard. Specifically, Defendants object to the following: "The actions of Officer Rodney Hall were unreasonably dangerous in a matter that caused the subject incident and resulted in Alexandra Davis' injuries to occur;" "The failure of Officer Rodney Hall to use reasonable force during his interaction with Alexandra Davis was not prudent for a Columbus Police Officer, and violated the standard of care for a Columbus Police Officer, and Officer Hall's violation of the standard of care for a Columbus Police Officer deprived Alexandra Davis of the protection she was entitled to;" and "Had Officer Rodney Hall been properly supervised and had he implemented reasonable force during his interaction with Alexandra Davis, the subject incident would have been prevented and Alexandra Davis' injuries would not have occurred." (ECF No. 51 at PageID 980-981; *see also* ECF No. 58 at PageID 1018). Defendants argue these findings are inadmissible because they are legal conclusions and may confuse the trier of fact. This Court agrees. It is improper for Mr. Gerard to testify whether the officers in this case used reasonable force. Accordingly, Defendants' objections to findings 1, 2, and 4 in Mr. Gerard's report are **SUSTAINED**. Mr. Gerard, however, may testify to nationally accepted police practices regarding the use of excessive force, as well as policies and procedures regarding the use of excessive force.

### B. Motion for Summary Judgment

Excluding claims made by Plaintiff Williams and claims against Defendant Officer Davis that were dismissed, Defendants argue for summary judgment based on the following: (1) Plaintiff Davis failed to name Defendants John and Jane Does Nos. 1-15; (2) Plaintiff Davis' federal claims against Defendant Quinlan fail because he was not involved in her arrest; (3) Plaintiff Davis' state law claim against Defendant Quinlan fails because he is entitled to immunity; (4) Plaintiff Davis' federal *Monell* claims against Defendant City of Columbus fail because there was no constitutional violation, improper policy, improper legislative enactment or official policy, final decision-maker approval, inadequate training or supervision, or custom of tolerance or acquiescence; (5) Plaintiff Davis' state law claim against Defendant City of Columbus fails because the city is entitled to immunity; and (6) Plaintiff Davis fails to establish claims against Defendants in their official capacities. The Court will address each of Defendants' arguments in turn.

### 1. *Claims Against Defendants John and Jane Doe Nos. 1-15*

Starting with Defendants' argument that Defendants John and Jane Doe Nos. 1-15 have not been named, Rule 4(m) of the Federal Rules of Civil Procedure requires completion of service of process within 90 days after filing of a complaint. *See generally* Fed. R. Civ. P. 4(m). The Sixth Circuit has held that Rule 4(m)'s service requirement applies to the naming of unidentified defendants. *See Garner v. City of Memphis*, 576 Fed. App'x 460, 463 (6th Cir. 2014); *Petty v. Cnty. Of Franklin, Ohio*, 478 F.3d 341, 345 (6th Cir. 2007). If a plaintiff fails to meet the 90-day deadline in Rule 4(m), then the court must dismiss the action without prejudice or order that service be made within a specific time if the plaintiff shows good cause for failure to meet the deadline. Fed. R. Civ. P. 4(m); *Habib v. Gen. Motors Corp.*, 15 F.3d 72, 73 (6th Cir. 1994).

Here, Plaintiffs filed their complaint on March 30, 2022. (ECF No. 1). In order to comply with Rule 4(m), they were required to name and serve the unnamed defendants by June 28, 2022. Plaintiffs failed to do so and did not address their failure in their response in opposition to Defendants' motion for summary judgment. At oral argument, however, Plaintiffs admitted they identified the officer who arrested Plaintiff Davis as Officer Hall but did not name him as a Defendant. Plaintiffs ultimately conceded that the claims against Defendants John and Jane Doe Nos. 1-15 should be dismissed. Accordingly, summary judgment is **GRANTED** with respect to Defendants John and Jane Doe Nos. 1-15.

### 2.  *Federal Claims Against Defendant Quinlan*

This Court next turns to Defendants' argument that Plaintiff Davis fails to prove Defendant Quinlan was personally liable for allegedly violating her constitutional rights. Each officers' liability must be assessed individually based on their own actions. *Binay v. Bettendorf*, 601 F.3d 640, 650 (6th Cir. 2010); *see also Batson v. Hoover*, 355 F. Supp. 3d 604, 614 (E.D. Mich. 2018) ("[I]t is axiomatic that the plaintiff must prove the personal liability of each named defendant by proof of their individual wrongful conduct in order to prevail in a 1983 case.") (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009)). Indeed, each government official is liable only for her own misconduct, not for that of her subordinates. *Iqbal*, 556 U.S. at 667.

To hold an officer personally liable for claims such as the use of excessive force, the officer must have either: (1) actively participated in the use of excessive force; (2) supervised the officer who used excessive force; or (3) owed the victim a duty of protection against the use of excessive force. *Binay*, 601 F.3d at 650 (citing *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997)).

To state a claim of supervisory liability under § 1983, a plaintiff must plausibly allege that a defendant "authorized, approved, or knowingly acquiesced in the unconstitutional conduct … of

his subordinates through the execution of his job functions." *Does v. Whitmer*, 69 F.4th 300, 306 (6th Cir. 2023) (quoting *Crawford v. Tilley*, 15 F.4th 752, 761 (6th Cir. 2021)). For supervisory liability to attach, the plaintiff must allege "more than an attenuated connection" between the injury and the supervisor's wrongful conduct. *Id*. at 307 (citing *Peatross v. City of Memphis*, 818 F.3d 233, 241 (6th Cir. 2016)). In fact, "[s]loppiness, recklessness, or negligence is insufficient to establish [supervisory] liability." *Id*. (citing *Garza v. Lansing Sch. Dist.*, 972 F.3d 853, 866 (6th Cir. 2020)). Instead, "deliberate indifference, knowing acquiescence, tacit or implicit authorization, or failure to take precautions against likely violations may suffice." *Id*. (citations omitted).

As for owing a victim a duty of protection, the general rule is that an officer must intervene to prevent excessive force by other officers in his presence. *Bruner v. Dunaway*, 684 F.2d 422, 426 (6th Cir. 1982). To be liable under a duty of protection, however, there must be a showing that the officer observed or had reason to know that excessive force would be or was being used *and* had both the opportunity and the means to prevent the harm from occurring. *Turner*, 119 F.3d at 429 (emphasis added).

Defendants argue Defendant Quinlan cannot be held personally liable for this incident because he was not physically present for the incident, did not witness the incident, did not have the opportunity or means to prevent the incident, and did not order, direct, or otherwise authorize officers' contact with Plaintiff Davis that day. Plaintiff Davis does not directly respond to this argument. Instead, Plaintiff Davis references *Alsaada* and discusses how Defendant Quinlan ratified the constitutional violations in that case. (*See* ECF No. 47 at PageID 967-968).

This Court finds that Plaintiff Davis has failed to establish Defendant Quinlan's personal liability. As Defendants explain, Defendant Quinlan was not present for the incident, did not

witness the incident, did not direct or otherwise authorize the incident to occur, and did not have the opportunity and means to prevent the incident. (*See* ECF No. 37-3 at PageID 832). Additionally, there is no evidence before this Court that, in this case, Defendant Quinlan engaged in "deliberate indifference, knowing acquiescence, tacit or implicit authorization, or failure to take precautions against likely violations." *Does*, 69 F.4th at 307. In fact, Defendant Quinlan's name does not appear anywhere in the facts section of Plaintiffs' complaint. Further, in Plaintiff Davis' response in opposition to Defendants' motion for summary judgment, Defendant Quinlan is only referenced in regards to his actions in *Alsaada* and how they relate to Plaintiff Davis' *Monell* claims against the City of Columbus. Accordingly, summary judgment is **GRANTED** with respect to federal claims against Defendant Quinlan.

### 3. *State Claim Against Defendant Quinlan*

This Court next turns to Defendants' argument that Plaintiff Davis' state law claim of negligence against Defendant Quinlan fails because he is entitled to immunity. Under Ohio law, employees of a political subdivision are presumptively immune from liability. *See generally* R.C. § 2744.03(A)(6). Specifically, Ohio law grants immunity to an employee of a political subdivision except when the employee's acts or omissions were manifestly outside the scope of the employee's employment or official responsibilities, or made with malicious purpose, in bad faith, or in a wanton or reckless manner. R.C. § 2744.03(A)(6). It is the plaintiff's burden to demonstrate how an employee's actions warrant a loss of immunity. *Wiley v. City of Columbus, Ohio*, 36 F.4th 661, 671 (6th Cir. 2022) (citing *Cook v. City of Cincinnati*, 103 Ohio App. 3d 80, 658 N.3.2d 814, 820-21 (Ohio Ct. App. 1995)).

Here, Defendants argue that none of the exceptions to immunity listed in R.C. § 2744.03(A)(6) applies to Defendant Quinlan because he was acting within the course and scope of

his employment and official responsibilities, and he did not have any role in the incident so there are no actions or omissions which could have been malicious, made in bath faith, or wanton or reckless. Plaintiff Davis does not respond to this argument.

This Court finds Defendant Quinlan is immune from Plaintiff Davis' state law claim of gross negligence under R.C. § 2744.03(A)(6). Under Ohio law, gross negligence is defined "in terms of wanton or reckless conduct." *Mohat v. Horvath*, 2013-Ohio-4290, 2013 WL 5450296, ¶ 23 (Ohio Ct. App. Sept. 30, 2013). Wanton misconduct is defined as "a failure to exercise any care toward those to whom a duty of care is owing when the probability that harm will result from such failure is great and such probability is actually known to the defendant." *Anderson v. City of Massillon*, 134 Ohio St.3d 380, ¶ 24, 2012-Ohio-5711, 983 N.E.2d 266, 272 (2012) (citation omitted). Reckless conduct is defined by "the conscious disregard of or indifference to a known or obvious risk of harm to another that is unreasonable under the circumstances and is substantially greater than negligent conduct." *Id*. at ¶ 34 (citations omitted). There is no evidence before this Court that Officer Quinlan acted with the requisite state of mind. *See Wiley*, 36 F.4th at 671. Again, Defendant Quinlan's name does not appear anywhere in the facts section of Plaintiffs' complaint, and in Plaintiff Davis' response in opposition to Defendants' motion for summary judgment, Defendant Quinlan is only referenced in regards to his actions in *Alsaada* and how they relate to Plaintiff Davis' *Monell* claims against the City of Columbus. Accordingly, summary judgment is **GRANTED** with respect to the state claim against Defendant Quinlan.

### 4. *Federal Claims Against Defendant City of Columbus*

This Court next turns to Defendants' argument that Plaintiff Davis has failed to establish municipal liability against Defendant City of Columbus. A plaintiff may hold a municipality liable under § 1983 for the constitutional violations of its employees when "the action that is alleged to

be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 90 (1978). It is important to stress, however, that municipal liability is not *respondeat superior* liability; instead, a plaintiff must show that the municipality's *own* actions subjected him to a deprivation of rights in violation of the constitution. *Id.* at 692 (emphasis added); *see also Jackson v. City of Cleveland*, 925 F.3d 793, 828 (6th Cir. 2019) ("A municipality may not be held liable under § 1983 on a *respondeat superior* theory—in other words, solely because it employs a tortfeasor.") (internal quotation marks and citation omitted). As such, in municipal liability cases, "the question [is] whether there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989).

### a. *Constitutional Violation*

Before pursuing a *Monell* claim, though, this Court must first consider whether officers violated Plaintiff Davis' constitutional rights. *Colemon v. City of Cincinnati*, No. 21-5968, 2023 WL 5095804, at *4 (6th Cir. Aug. 9, 2023) ("Supreme Court and Sixth Circuit precedent holds that a constitutional injury is required to pursue a *Monell* claim.") (citations omitted). In this case, Plaintiff Davis alleges Defendants violated her Fourth Amendment right against excessive force and her First Amendment right to free speech and assembly. (ECF No. 1 ¶¶ 32-37). This Court will address each alleged violation in turn.

### (1) *Fourth Amendment Claim*

The Fourth Amendment prohibits the use of excessive force during arrest. *Barton v. Martin*, 949 F.3d 938, 952 (6th Cir. 2020) (citing *Getz v. Swoap*, 833 F.3d 646, 652 (6th Cir. 2016)). When making an arrest, though, officers have "the right to use some degree of physical coercion or threat thereof to effect it." *Graham v. Connor*, 490 U.S. 386, 396 (1989). In

determining whether the use of force in effecting an arrest is excessive in violation of the Fourth Amendment, the court must determine "whether the officers' actions [were] 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id*. at 397 (citing *Scott v. United States*, 436 U.S. 128, 137-39 (1978)). When analyzing an excessive force claim, the court is to assess the use of force as "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Goodwin v. City of Painesville*, 781 F.3d 314, 321 (6th Cir. 2015) (quoting *Graham*, 490 U.S. at 396).

Overall, the court is to determine "whether the totality of the circumstances justifies a particular level of force." *Wright v. City of Euclid, Ohio*, 962 F.3d 852, 865 (6th Cir. 2020) (quoting *Coffey v. Carroll*, 933 F.3d 577, 588 (6th Cir. 2019)). Said differently, the court "must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Tennessee v. Garner*, 471 U.S. 1, 8 (1985) (citations omitted). Factors the court are to consider include: (1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officers or others; and (3) whether he is actively resisting arrest or attempting to evade arrest by flight. *Graham*, 490 U.S. at 396 (hereinafter the "*Graham* factors"). The court may also consider the following: the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; and any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue. *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015).

Here, Defendants argue Plaintiff Davis fails to allege a violation of the Fourth Amendment because Defendants maintain officers used reasonable force during the incident. Specifically,

23

Defendants claim officers used "level 0" tactics to try to get Plaintiff Davis to stop spitting by giving her verbal commands to stop. Defendants maintain that it was not until the level 0 tactics failed and Plaintiff Davis allegedly spit on an officer that they put hands on her. Defendants maintain officers properly used "level 1" tactics to arrest Plaintiff Davis by grabbing her arm to get her to stand up, and when she resisted standing up, bringing her into the street to isolate her from the other protestors and safely handcuff her. (*See* ECF No. 37 at PageID 810-812).

Plaintiff Davis responds that officers used unreasonable force by dragging her into the street to arrest her. Plaintiff Davis argues officers should have disengaged with her or provided her an opportunity to stand up on her own before dragging her. (*See* ECF No. 58 at PageID 1013-1014).

<u>*Graham* Factor #1 – Severity of the Crime at Issue</u>

This Court finds that there is a genuine dispute of material fact whether Plaintiff Davis' spitting was a severe crime since it is contested whether Plaintiff Davis did, in fact, spit on the officer's boot. While Defendants claim Plaintiff Davis' spit made contact with the officer's boot, Plaintiff Davis claims she spit on the ground and did not spit on the officer. The video footage does not definitively show where Plaintiff Davis spit (i.e. whether she spit on the ground or the officer's boot), and the detective who reviewed the footage acknowledged as such. (ECF No. 46 at PageID 938). There is also no laboratory evidence or photographic evidence before the Court demonstrating that Plaintiff Davis did, in fact, spit on the officer's boot. As discussed above, at the summary judgment stage, the Court must view factual evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Barrett*, 556 F.3d at 511. Accordingly, this Court does not find that Plaintiff Davis did, in fact, spit on the officer.

Whether Plaintiff Davis' saliva made contact with the officer is material because on the one hand, her saliva making contact with the officer could be Harassment with Bodily Substance, a violation of Ohio Revised Code § 2921.38(B), which is a fifth-degree felony. R.C. § 2921.38(D). On the other hand, an attempt to commit an offense under § 2921.38(B) is only a misdemeanor of the first degree. *State v. Chapple*, 2011-Ohio-5670, ¶ 19, 2011 WL 5237304, at *3 (Ohio Ct. App. Nov. 3, 2011) (citing R.C. § 2923.02(E)(1)). And, of course, merely spitting on the ground or spitting at an officer without the requisite intent is not an offense at all.

While Plaintiff Davis did not plead a claim of false arrest, if her spit did not make contact with the officer, then the officer would not have had probable cause to arrest her or would have only had probable cause to believe that she committed an attempt-offense, which, as explained above, is a minor misdemeanor. In that scenario, this case would be similar to cases where the first *Graham* factor weighed in favor of a finding of excessive force because officers were investigating a defendant for non-serious offenses. *See, e.g., Coffey v. Carroll*, 933 F.3d 577, 588 (6th Cir. 2019) (misdemeanor offense of attempted larceny from a motor vehicle was not a particularly serious crime for excessive force analysis); *Brown v. Chapman*, 814 F.3d 447, 459 (6th Cir. 2016) (driving without headlights on and refusing to provide identification were not severe crimes for excessive force analysis); *Goodwin v. City of Painesville*, 781 F.3d 314, 322 (6th Cir. 2015) (disorderly conduct was not a serious crime for excessive force analysis). Given there is a genuine dispute of material fact whether this was a serious crime or no crime at all, this Court finds that the first *Graham* factor weighs in favor of a finding of excessive force.

*Graham* Factor #2 – Immediate Threat to the Safety of the Officers or Others

As to the second *Graham* factor, officers admitted they did not fear Plaintiff Davis doing harm to them. (ECF No. 34-1 at PageID 461). Additionally, this Court, when viewing the evidence

25

in the light most favorable to non-movant Plaintiff Davis, found that she did not, in fact, spit on the officer. Since she did not spit on the officer, she was not an immediate threat to the officer's safety. Accordingly, this Court finds the second *Graham* factor weighs in favor of a finding of excessive force.

<u>*Graham* Factor #3 – Whether Defendant is Actively Resisting Arrest</u>

The Sixth Circuit has been clear that an officer cannot use injurious physical force to subdue a suspect that is not actively resisting arrest. *Meadows v. City of Walker*, 46 F.4th 416, 422 (6th Cir. 2022) (citing *Rudlaff v. Gillispie*, 791 F.3d 638, 641-42 (6th Cir. 2015)). In fact, the Sixth Circuit asserted "[a] suspect has a clearly established constitutional right to be free from the use of physical force by police officers when he is not resisting efforts to apprehend him." *Coffey v. Carroll*, 933 F.3d 577, 589 (6th Cir. 2019); *see also Hagans v. Franklin Cnty. Sheriff's Off.*, 695 F.3d 505, 509 (6th Cir. 2012) (summarizing cases from 2004 onwards where the Sixth Circuit held force to be excessive from the use of a taser when the suspects were compliant or had stopped resisting).

Said differently, the Sixth Circuit has confirmed "the Fourth Amendment prohibits officers from using 'gratuitous' force that is unnecessary to effectuate the arrest of a person who has ceased resisting." *Gambrel v. Knox Cnty., Ky.*, 25 F.4th 391, 402 (6th Cir. 2022) (quoting *Shreve v. Jessamine Cnty. Fiscal Ct.*, 453 F.3d 681, 688 (6th Cir. 2006)); *see also id.* at 402-03 (summarizing cases where the Sixth Circuit held the following was excessive force: hitting a nonresisting arrestee with a baton; slamming a cooperating arrestee against a cupboard and tossing him down a small set of stairs; striking a nonresisting arrestee ten times with a baton and using a taser against him four times; slapping a handcuffed arrestee in the face; and slamming an arrestee to the ground, driving a knee into the arrestee's temple, stepping on the arrestee's hand, and punching the arrestee

in the ribs); *see also Lyons v. City of Xenia*, 417 F.3d 565, 578 (6th Cir. 2005) (summarizing cases where circuit courts found tackling rose to the level of excessive force because either the claimants did not pose a tenable threat to the officers' safety, the police did more than just tackle the suspect, or the police did not have an adequate level of suspicion to justify any seizure at all).

In this case, this Court finds there is a genuine dispute of material fact as to when officers advised Plaintiff Davis that she was under arrest and whether officers gave her an opportunity to stand up on her own and comply before dragging her into the street. Officer Hall claims he told Plaintiff Davis she was under arrest and gave her an opportunity to stand up on her own before touching her. (ECF No. 34-1 at PageID 469; ECF No. 34-2 at PageID 519). In contrast, Plaintiff Davis claims officers laid hands on her without letting her get up on her own and comply, and officers did not advise her she was under arrest until they already had their hands on her. (ECF No. 35-1 at PageID 615-616, 631; ECF No. 1 ¶ 17). Officer Bishop, who assisted with Plaintiff Davis' arrest, stated he does not remember specifically if Officer Hall asked Plaintiff Davis to stand up. (ECF No. 32-1 at PageID 289). In the video footage, particularly Video 2, it appears to the Court that officers told Plaintiff Davis she was under arrest after grabbing her and starting to drag her into the street. The timing of when Plaintiff Davis was told she was under arrest and whether officers gave her an opportunity to stand up on her own and comply is material because her subsequent alleged resistance is reasonable if she did not know she was under arrest and was not given an opportunity to comply with the arrest.

As indicated, this Court finds there is a genuine dispute of material fact as to whether Plaintiff Davis was resisting arrest and, if so, to what extent. Defendants claim after officers told Plaintiff Davis she was under arrest, she refused to get off the ground and was using her "dead weight" to resist. (ECF No. 34-1 at PageID 477). While Plaintiff Davis was being dragged to the

street, Defendants claim she continued to resist arrest by pulling away and trying to kick at officers. (ECF No. 34-1 at PageID 478). Defendants argue they needed to move Plaintiff Davis from the sidewalk to the street in order to safely arrest her. (ECF No. 37 at PageID 811-812). Defendants' expert explained it would have been problematic for officers to handcuff Plaintiff Davis as she was sitting on the sidewalk because they would have put their back to the protestors who were chanting in opposition to the police. (ECF No. 37-4 at PageID 838). Additionally, an officer explained the purpose of moving a suspect to the center of the street to arrest them was to keep the crowd of protestors separated from the officers and the suspect in order to avoid the situation from escalating into one where other individuals could get arrested. (ECF No. 33-1 at PageID 380-381).

In contrast, Plaintiff Davis states she was not going "dead weight" or otherwise resisting; rather, officers just grabbed her from the sidewalk and proceeded to drag her into the street. (ECF No. 1 ¶ 17; ECF No. 35-1 at PageID 615, 632, 634, 640). Plaintiff Davis, though, admits officers were telling her repeatedly to "stop resisting." (ECF No. 35-1 at PageID 616). Additionally, in Videos 1, 2, and 5, this Court can hear Plaintiff Davis screaming repeatedly to get off of her and officers responding by saying to stop resisting arrest and to put her hands behind her back. In Video 2, however, Plaintiff Davis responds to officers that she could not put her hands behind her back because she was "on it." Plaintiff Davis explained in her deposition that her arm was stuck underneath her breast and the officers would not get off of her for her to be able to remove her arm and comply. (ECF No. 35-1 at PageID 615).

When viewing the evidence in the light most favorable to Plaintiff Davis, this Court finds the third *Graham* factor weighs in favor of a finding of excessive force. This Court can see in the video footage two officers start to drag Plaintiff Davis to the street and then multiple officers swarm Plaintiff Davis and yank on her arms and other parts of her body. Plaintiff Davis described

feeling knees in her back and hands on her neck and ankle. (ECF No. 35-1 at PageID 615). At the time, Plaintiff Davis was wearing a dress with her bare legs exposed to the concrete and she did not have shoes on. Defendants' argument that they needed to move her to an open space in order to isolate her from the crowd and safely detain her is not persuasive given that the Court can see in the video footage only a few people around Plaintiff Davis when she was being arrested. When considering the totality of the circumstances, this Court finds the third *Graham* factor weighs in favor of a finding of excessive force.

Given that there is a genuine dispute of material fact as to whether Plaintiff Davis committed any offense—let alone a serious offense, whether she was given an opportunity to stand up on her own and comply with arrest, and whether/to what extent she was resisting, this Court finds the question of whether officers violated Plaintiff Davis' Fourth Amendment right against excessive force must be submitted to a jury.

(2) *First Amendment Claim*

This Court next turns to Plaintiff Davis' First Amendment claim. In order to succeed on a First Amendment retaliation claim, the plaintiff must demonstrate the following: "(1) that she was engaged in a constitutionally protected activity; (2) that the defendant's adverse action caused the plaintiff to suffer an injury that would likely chill a person of ordinary firmness from continuing to engage in that activity; and (3) that the adverse action was motivated at least in part as a response to the exercise of the plaintiff's constitutional rights." *Strouss v. Michigan Dept. of Corrections*, 250 F.3d 336, 345 (6th Cir. 2001) (citations omitted).

Defendants argue Plaintiff Davis fails to demonstrate officers violated her First Amendment rights because her arrest was in response to her allegedly spitting on the officer's boot, and not her protesting. Plaintiff Davis only states in conclusory fashion that she satisfies all

three elements of a First Amendment retaliation claim. (*See* ECF No. 47 at PageID 960). During Plaintiff Davis' deposition, however, she could not answer how officers inhibited her free speech rights. Specifically, the question and answering went as follows:

> Q: How do you feel that the officers' actions inhibited your free speech rights?
> A: I don't really know how to answer that question. I feel like it was more than just them taking away my freedom of speech. You took away my bodily autonomy. You took away my peace and my safety. It was more than just freedom of speech that was taken away from me.
>
> . . .
>
> Q: Is it because you were arrested then?
> A: It was because I was attacked. I was jumped by grown men.
> Q: Other than that, before that happened, how were they inhibiting your right to free speech?
> A: I don't know.

(ECF No. 35-1 at PageID 630-631). Additionally, Plaintiff Davis said in her deposition that she and her group of friends were not by the other protesters at the time of the incident. (*Id*. at PageID 594-595) ("We were on High and Broad. The protesters were by the courthouse. We were not by the protesters."). Based on Plaintiff Davis' deposition, it appears to this Court that Plaintiff Davis' complaints all relate to her Fourth Amendment excessive force claim.

Ultimately, this Court finds Plaintiff Davis has not established a First Amendment retaliation claim given that officers undisputedly told Plaintiff Davis multiple times to stop spitting or she would be arrested, and an officer told his sergeant that he was going to arrest Plaintiff Davis if she spit on him. Additionally, the video evidence shows Plaintiff Davis was not arrested when she was chanting or yelling at police but rather when she was sitting on the sidewalk in front of officers and spitting. Video 1 confirms the chain of events since it shows Plaintiff Davis sit down on the sidewalk, rock forward several times where the Court can see exhalation, and then almost immediately grabbed by officers and dragged in the street and handcuffed. Accordingly,

Defendants' motion for summary judgment is **GRANTED** with respect to Plaintiff Davis' First Amendment claim against Defendant City of Columbus.

b.  *Municipal Liability Under Monell*

Having found a genuine dispute of material fact whether officers used excessive force in arresting Plaintiff Davis, this Court next turns to Plaintiff Davis' *Monell* claim against the City of Columbus.[13] To demonstrate *Monell* liability, a plaintiff must: (1) identify the policy or custom; (2) connect the policy to the governmental entity; and (3) show causality—i.e., that an injury of a constitutional magnitude occurred because of that policy or custom's execution. *Alkire v. Irving*, 330 F.3d 802, 815 (6th Cir. 2003) (internal citations omitted). The Sixth Circuit has explained that there are four general avenues for a plaintiff to prove the existence of a municipality's illegal policy or custom; specifically, the plaintiff must show either: "(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision-making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations." *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013). Here, Plaintiff Davis argues that the second and third avenues for *Monell* liability apply. Specifically, Plaintiff Davis argues officers were not given proper training and supervision the night of the incident and the City of Columbus ratified the officers' illegal actions.

(1)  *Inadequate Training and Supervision*

This Court will start with Plaintiff Davis' failure to train and supervise argument. As a threshold matter, "courts recognize a systematic failure to train police officers adequately as custom or policy which can lead to city liability. *Gregory v. City of Louisville*, 444 F.3d 725, 753

---

[13] This Court notes that the Sixth Circuit has found that a municipality can be held liable even if no individual officer violated the Constitution where constitutional harm has nonetheless "been inflicted upon the victim" and the municipality is responsible for that harm. *Grote v. Kenton Cnty., Ky.*, 85 F.4th 397, 414 (6th Cir. 2023) (citing *Epps v. Lauderdale County*, 45 Fed. App'x 332, 334 (6th Cir. 2002) (Cole, J., concurring)).

(6th Cir. 2006) (citing *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)). To establish municipal liability for a failure to train, a plaintiff must show: "(1) the training program is inadequate to the task the officer must perform, (2) the inadequacy is a result of the municipality's deliberate indifference, and (3) the inadequacy is 'closed related to' or 'actually caused' the plaintiff's injury." *Bonner-Turner v. City of Ecorse*, 627 Fed. App'x 400, 413-14 (6th Cir. 2015) (quoting *Plinton v. Cnty. of Summit*, 540 F.3d 459, 464 (6th Cir. 2008)).

(a) <u>Parties' Arguments</u>

Here, Plaintiff Davis argues because the officers were members of the Mobile Field Force the night of the incident, they were supposed to receive specialized training and instruction in field force operations. In particular, Plaintiff Davis, relying on her expert, Mr. Gerard, argues the officers should have been given instruction regarding arrestable offenses that night, who would be on arrest teams, and team tactics for effecting an arrest. Instead, officers were just generally briefed to keep people out of the street, protect property, and ensure everybody's safety.

Plaintiff Davis maintains that the officers' lack of training and supervision in field force operations was a result of the city's deliberate indifference and caused her injuries in this case. In terms of deliberate indifference, Plaintiff Davis relies on the pattern of constitutional violations shown in *Alsaada*. Alternatively, Plaintiff Davis argues the single-incident theory of liability applies since she claims the potentially volatile circumstances in the George Floyd protests made it obvious that without proper field force training and supervision, incidents and injuries like the ones in this case would occur.

Defendants respond that CPD officers receive extensive training at the police academy, at a field force training program, and in continuing training and education. Additionally, Defendants argue Plaintiff Davis fails to demonstrate how a pre-operational briefing designating arrestable

offenses and arrest teams/tactics was required or would have led to a different outcome in this case. Further, Defendants argue there is no deliberate indifference based on a pattern of violations theory because this case is factually distinct from *Alsaada*. Specifically, Defendants argue *Alsaada* dealt primarily with nonviolent protestors and collective punishment in response to the bad actions of a few people, whereas this case deals with one individual—Plaintiff Davis—who was arrested for allegedly committing a felony offense and officers only used level 1 force to arrest her after level 0 force failed (as opposed to level 7 force used in *Alsaada*). Last, Defendants argue there is no deliberate indifference under a single-incident theory of liability because officers received extensive training and there were relevant manuals and directives in place.

(b) <u>Court's Findings and Analysis as to Failure to Train and Supervise</u>

This Court finds Plaintiff Davis has shown a genuine issue of material fact whether officers were properly trained and supervised in this case, specifically in field force operations, use of force, and de-escalation techniques. Before discussing the Court's analysis as to failure to train and supervise, this Court finds it necessary to discuss the evidence of training within the record. First, former CPD Chief Quinlan stated that all CPD officers must complete a basic recruit training program, which consists of 1,000 plus hours of training and instruction on, among other things: the safe, proper, and effective use of non-lethal force; the law and legal limits applicable to the use of non-lethal force; current law and legal limits applicable to arrests, searches, and seizures; community diversity; and de-escalation techniques. (ECF No. 37-3 ¶¶ 5, 6). The program exceeds the State of Ohio's requirements for such training. (*Id*. ¶ 7). Additionally, new CPD officers must complete a field officer training program, which is about 15 weeks of one-on-one training with veteran officers who observe, evaluate, and record their performance in the field and offer additional advice, training, and instruction to the new officers when and where necessary. (*Id*. ¶¶

8, 9).[14] Further, CPD officers receive frequent, updated, and regularly-scheduled continuing education, training, and instruction on all of the topics discussed above. (*Id*. ¶ 10).

Second, the Court is in receipt of the Columbus Police Field Force Operations Manual (hereinafter "field force manual") (ECF No. 32-5), Columbus Police Division Directive on the Use of Force (hereinafter "use of force directive") (ECF No. 34-7), and Columbus Police Emergency Operations Manual on Civil Disturbance Tactics (hereinafter "civil disturbance manual") (ECF No. 34-6) (collectively referred to as "manuals and directives"). During depositions, officers involved in this case confirmed that they have been trained on these manuals and directives and that they read any updated manuals or directives that are published. (*See* ECF No. 32-1 at PageID 306, 279-280; ECF No. 34-1 at PageID 493-494).

The field force manual states that during field force operations, squads may be assigned specific tasks within the field force, such as arrest teams. (ECF No. 32-6 at PageID 332). Additionally, the field force manual states the decision to arrest is made by the field force leader. (*Id*.). Further, the field force manual states officers should arrest individuals during a civil disturbance only as necessary. (*Id*. at PageID 343).[15] While the field force manual recognizes that impromptu disturbances may arise requiring immediate action, such as arrests, such action should occur only if it can be accomplished safely with available personnel. (*Id*. at 344). In fact, the field force manual states individual actions are discouraged except in life-threatening circumstances. (*Id*. at 331).

The use of force directive states "[w]hen reasonable, sworn personnel should try to de-escalate a situation by using trained techniques, such as building rapport, communication skills,

---

[14] It is worth noting an officer described field force training in his deposition as merely "preparing for potential riots, handling rioters." (ECF No. 34-1 at PageID 472).

[15] Officer Hall stated that due to the amount of manpower and the size of the protests, the officers did not want to make an arrest during that time unless they had to. (ECF No. 34-1 at PageID 491).

taking cover, etc. This is not an all inclusive list." (ECF No. 34-7 at PageID 542). The use of force directive also provides factors, similar to the *Graham* factors, to be considered when determining the reasonableness of a use of force, specifically: (a) the severity of the crime at issue; (b) whether the subject poses an immediate threat to the safety of the officer or others; (c) whether the subject is actively resisting arrest; and (d) whether the subject is attempting to evade arrest by flight. (*Id.*).

The civil disturbance manual states an operational objective, consistent with the National Response Plan and the National Incident Management System, as: "Arresting individuals during a civil disturbance only as necessary." (ECF No. 34-6 at PageID 537). Additionally, the civil disturbance manual states: "[w]hen faced with agitators, officers must project a calm, professional image;" "[a]ll actions including arrests should be accomplished as a team;" and "[a]n officer should not act independently in an unruly crowd as this can lead to unsuccessful and dangerous operations." (*Id.* at PageID 539).

In this case, the officers' actions demonstrate that they were not properly trained and supervised on field force operations, use of force, and de-escalation techniques. In fact, this case is similar to *Wright v. City of Euclid, Ohio*. In *Wright*, the city's police officers received some training on the proper use of force and there were some policies and procedures in place, but the Sixth Circuit nonetheless found a reasonable juror could find that the training, policies, and procedures were deficient. 962 F.3d 852, 881 (6th Cir. 2020). Specifically, in *Wright*, officers were read the use of force policy at rollcall and sometimes received a follow up quiz. *Id*. The officers also engaged in practical training exercises, but the scenarios never changed and the officers' performances were never evaluated. *Id*. Further, the policies and procedures mandated that the department establish and maintain a training committee, but no such training committee ever existed. *Id*.

Here, as described above, Defendants provided the Court with general information that CPD officers get trained at the police academy and in subsequent training, and that officers periodically read updates to the relevant manuals and directives. The Court has no information, however, on when the officers involved in this case underwent initial training or subsequent training. The Court is not in receipt of any training certificates, training calendars, training rosters, or other evidence on the training completed by these individual officers. The timing of officers' training is important considering the officers in this case had been with CPD for over ten years.[16] If the officers in this case did not receive training in years, then a jury may well find a failure to train. Indeed, contrary to former CPD Chief Quinlan's testimony, Officer Bishop stated he was not aware of any field force operations training other than the training he received at the academy and reading revisions to the manuals and directives. (ECF No. 32-1 at PageID 307).

The Court also has no evidence that the officers involved in this case were particularly experienced in field force operations such that subsequent training was not necessary or did not need to occur as frequently. In fact, Officer Hall stated he had only done field force operations two times: during the George Floyd protests and another riot that occurred "a few years" back. (ECF No. 34-1 at PageID 494-495). He did not discuss any subsequent training.

Additionally, the Court has no evidence that the officers were actually trained on updates to the manuals and directives; rather, Officer Bishop stated officers receive updates electronically via the database and just have to sign something electronically indicating they have read them. (ECF No. 32-1 at PageID 306-307). Based on the evidence presented, there does not seem to be anything else in place to ensure that officers have actually read the updates, understand them, and

---

[16] In their depositions, Officer Hall stated that he was approaching sixteen years with CPD (ECF No. 453-454); Officer Bishop was approaching eleven years with CPD (ECF No. 32-1 at PageID 257); and Officer Davis was approaching thirteen years with CPD (ECF No. 33-1 at PageID 365).

are prepared to implement them. In fact, when asked when force can be used in these field force situations based on his training, Officer Hall stated officers can use force under any circumstances to effect an arrest and if a person is resisting arrest, officers can use whatever force is necessary to effectuate the arrest. (ECF No. 34-1 at PageID 474). Based on Officer Hall's answer, it does not appear he actually understands the manuals and directives regarding use of force, especially during field force operations.

Further, there is no evidence before the Court that relevant policies and directives were followed the night of the incident. Specifically, there is no evidence that a field force leader was in charge;[17] that arrest teams were designated; that direction was given regarding arrestable offenses; that specific instructions were given about how to handle arrestees; or that any specific rules of engagement were provided. (ECF No. 32-1 at PageID 265, 267; ECF No. 34-1 at PageID 473, 490). In fact, when Officer Hall was asked what instructions they were given that night, he said: "Nothing. Just specifically just go out there and, you know, keep them out of the street, protect property, and ensure everybody's safety and keep the officers safe." (ECF No. 34-1 at PageID 472-473).

There is also no evidence before the Court that the objective to arrest individuals during civil disturbances only when necessary was followed the night of the incident. While Plaintiff Davis was warned if she continued to spit she would be arrested, her arrest was ultimately not necessary, especially since it is disputed whether Plaintiff Davis' spit even made contact with the officer. Even if she did spit near the officer, as Plaintiff Davis' expert indicated, Officer Hall could have disengaged from Plaintiff Davis, which is a recognized tactic in law enforcement. (ECF No. 47 at PageID 948). Officer Hall admitted that officers did not think to have Officer Hall switch

---

[17] Officers could not recall who the field force leader or incident commander was the night of the incident, indicating leaders rotated daily (ECF No. 32-1 at PageID 262, 304; ECF No. 34-1 at PageID 490, 492).

positions with another officer to de-escalate the situation. (ECF No. 34-1 at PageID 467-477). Or, at a minimum, the officers should have followed proper protocols established within the manuals and directives for effecting an arrest during field force operations and civil disturbances. Specifically, arrest teams should have been designated, arrestable offenses should have been specified, a field force leader should have authorized Plaintiff Davis' arrest, and an arrest team should have safely arrested Plaintiff Davis. None of that happened here. Instead, a single officer, Officer Hall, attempted to arrest Plaintiff Davis despite the directive that individual actions are discouraged. And when he was unsuccessful, two officers proceeded to drag Plaintiff Davis into the street with her bare legs and feet exposed, and then multiple officers swarmed her and yanked at her arms and other parts of her body.

Moreover, there is no evidence of supervision in this case. Officer Hall's sergeant merely saying "okay" in response to Officer Hall stating he would arrest Plaintiff Davis if she spit on him was not proper supervision, especially since former CPD Chief Quinlan confirmed "[s]ergeants do not have final decision making authority at CPD." (ECF No. 37-3 ¶ 13). In fact, decisions made by sergeants are supposed to be "subject to review by those higher in the chain of command including, but not limited to, lieutenants, the chief of police, and the public safety director." (*Id.*). Again, none of that happened with Plaintiff Davis' arrest and there is no evidence that her arrest was the result of some impromptu disturbance that required an immediate arrest. In fact, Officer Hall stated he had already told her multiple times to stop spitting and had a conversation with his sergeant about arresting her in the future if she spit on him. During that time, a proper plan to arrest her could have been established, but that did not happen.[18]

---

[18] Officer Hall stated that the whole incident with Plaintiff Davis, from his first interaction with her telling her to stop spitting to her arrest was roughly within a ten to fifteen minute timeframe. (ECF No. 34-1 at PageID 483-484).

Ultimately, had Officer Hall disengaged from Plaintiff Davis or had the proper protocols/practices been followed, then the "chaotic" situation of Plaintiff Davis being dragged into the street with her bare legs and feet exposed and subsequently swarmed and yanked by officers would have been avoided altogether. Accordingly, this Court finds Plaintiff Davis has established a genuine dispute of material fact as to failure to train and supervise.

(c)  <u>Court's Findings and Analysis as to Deliberate Indifference</u>

This Court next turns to the deliberate indifference requirement for a municipality to be liable under failure to train and supervise theories of liability. To show deliberate indifference, a plaintiff must prove either a pattern of similar constitutional violations by untrained employees or a single violation of federal rights, accompanied by a showing that the municipality has failed to train its employees to handle recurring situations presenting an obvious potential for a constitutional violation. *Morgan by next friend Morgan*, 33 F.4th at 329 (citing *Shadrick v. Hopkins Cnty.*, 805 F.3d 724, 738-39 (6th Cir. 2015)) (quotation marks omitted). The Supreme Court explained the deliberate indifference standard as follows:

> The issue ... is whether that training program is adequate; and if it is not, the question becomes whether such inadequate training can justifiably be said to represent "city policy." It may seem contrary to common sense to assert that a municipality will actually have a policy of not taking reasonable steps to train its employees. But it may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need. In that event, the failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury.

*Harris*, 489 U.S. at 390 (footnotes omitted).

This Court finds Plaintiff Davis' has shown a genuine dispute of material fact whether there was deliberate indifference in this case. This case and *Alsaada* involved the George Floyd protests and occurred around the same time period.[19] In *Alsaada*, the officers were given crowd-control training that included instruction that not all protestors were peaceful, so officers needed to be "mentally prepared to use force" against them. 536 F. Supp. 3d at 272; (*see* ECF No. 1 at PageID 21 ¶¶ 58-60). Consequently, officers used tear gas, pepper spray, flash-bang grenades, rubber bullets, wooden pellets, batons, body slams, pushing, pulling,[20] and kittling as crowd control measures and collective punishment. *Id.* at 230; (*see* ECF No. 1 at PageID 23-25, ¶¶ 72-88, 91, 93). In this case, similar to how the protests were viewed in *Alsaada*, Officer Hall characterized the protest as a riot rather than a civil disturbance or a peaceful demonstration. (ECF No. 34-1 at PageID 473-474, 496). In fact, Officer Hall stated he did not believe "any of them," meaning the George Floyd protests, were peaceful protests. (*Id.* at PageID 473). While officers did not use as extreme of excessive force against Plaintiff Davis, they nonetheless pulled on Plaintiff Davis' arms and/or neck and dragged Plaintiff Davis across the concrete into the street with her bare legs and ankles/feet exposed. Accordingly, Plaintiff Davis has established a genuine issue of material fact as to deliberate indifference in this case. Therefore, Defendants' motion for summary judgment is **DENIED** with respect to Plaintiff Davis' Fourth Amendment *Monell* claim against Defendant City of Columbus.[21]

---

[19] The protests in *Alsaada* began on May 28, 2020, and lasted throughout the spring and summer of 2020, including a demonstration on Father's Day—June 21, 2020. 536 F. Supp. 3d at 233. The incident in this case occurred shortly thereafter on June 29, 2020. (ECF No. 1 ¶ 13).

[20] In *Alsaada*, an officer pulled Plaintiff Nadia Lynch by her backpack, tackled her to the ground, and arrested her. 536 F. Supp. 3d at 244.

[21] To be clear, this Court is not ruling on the ultimate issue of liability; rather, it is only evaluating whether Defendant City of Columbus is entitled to judgment as a matter of law. Because this Court finds a reasonable jury could find City of Columbus responsible for Plaintiff Davis' constitutional injuries under failure to train and/or supervise through a pattern of similar constitutional violations or a theory of single-incident liability, City of Columbus is not entitled to summary judgment.

(2) *Ratification & Failure to Investigate*

Next this Court turns to Plaintiff Davis' argument that an official with final decision-making authority ratified the officers' illegal actions in this case and failed to investigate. A plaintiff can establish municipal liability by "showing that the municipality ratifies the unconstitutional acts of its employees by failing meaningfully to investigate and punish allegations of unconstitutional conduct." *Wright v. City of Euclid, Ohio*, 962 F.3d 852, 882 (6th Cir. 2020) (citing *Leach v. Shelby Cnty. Sheriff*, 891 F.2d 1231, 1247-48 (6th Cir. 1990)).

(a) <u>Parties' Arguments</u>

Here, Plaintiff Davis argues Mayor Ginther's and former CPD Chief Quinlan's depositions in *Alsaada* demonstrate that they received multiple complaints regarding CPD violating the constitutional rights of George Floyd protestors and essentially did nothing in response. In fact, Plaintiff Davis argues the city went one step further than ratification since they directed officers to view nonviolent protestors as violent and to be mentally prepared to use force against them. *See Alsaada*, 536 F. Supp. 3d at 271-72. Last, Plaintiff Davis argues that the detective assigned to Plaintiff Davis' criminal case failed to adequately investigate her arrest[22] and no other policy makers did any type of investigation.

Defendants argue Plaintiff Davis failed to develop the record as it relates to *Alsaada* since she only incorporated the *Alsaada* complaint into her complaint in this case and Mayor Ginther's and former CPD Chief Quinlan's depositions in *Alsaada* are not in the record in this case. Additionally, Defendants argue former CPD Chief Quinlan did not give approval for any of the actions taken in this case and the sergeant who stated "okay" to arresting Plaintiff Davis if she spit on the officer did not have final decision-making authority. Finally, Defendants argue there was

---

[22] This argument seems to relate to whether there was probable cause to arrest Plaintiff Davis and not whether alleged constitutional violations of her arrest were investigated.

no failure to investigate in this case because Plaintiff Davis never made a complaint with CPD about her arrest.

(b) Court's Findings and Analysis as to Ratification and Failure to Investigate

This Court finds that Plaintiff Davis has failed to establish a genuine dispute of material fact that an official with final decision-making authority ratified the officers' actions in this case or that failing to investigate this case represents an unofficial custom or tolerance. There is no evidence before the Court that Plaintiff Davis complained about her arrest to CPD. Additionally, the alleged failure to investigate Plaintiff Davis' arrest is not enough to constitute municipal liability. As the Sixth Circuit has explained, "an allegation of a single failure to investigate a single plaintiff's claim does not suffice." *Pineda v. Hamilton Cnty., Ohio*, 977 F.3d 483, 495 (6th Cir. 2020) (citing *Burgess*, 735 F.3d at 478-79; *Thomas v. City of Chattanooga*, 398 F.3d 426, 433-34 (6th Cir. 2005)). Rather, a *Monell* claim based on inadequate investigation requires "not only an inadequate investigation in this instance, but also a clear and persistent pattern of violations in earlier instances." *Id*. (citing *David v. City of Bellevue*, 706 F. App'x 341, 344 (6th Cir. 2017)) (internal quotation marks omitted). While Plaintiff Davis claims the City failed to investigate numerous cases of excessive force in *Alsaada*, her reliance on depositions that are not in the record in this case is not sufficient to establish municipal liability. Accordingly, this Court rejects Plaintiff Davis' ratification and failure to investigate theories of *Monell* liability.

5. *State Claim Against Defendant City of Columbus*

Next, this Court turns to Defendants' argument that Defendant City of Columbus is immune from Plaintiff Davis' state law negligence claim. Plaintiff Davis did not respond to this argument. Generally, "a political subdivision is not liable in damages in a civil action for injury, death, or loss to person or property allegedly caused by any act or omission of the political

subdivision." R.C. § 2744.02(A)(1). There are, however, five statutory immunity exceptions codified at R.C. § 2744.02(B). None of them applies in this case.

Specifically, exception 1 is inapplicable in this case since that exception involves operating a motor vehicle. *See generally* R.C. § 2744.02(B)(1). Exception 2 is also inapplicable in this case since that exception involves a political subdivision's proprietary functions. *See generally* R.C. § 2744.02(B)(2). Exception 3 is likewise inapplicable in this case since that exception involves failure to keep public roads in repair. *See generally* R.C. § 2744.02(B)(3). Exception 4 is also inapplicable in this case since that exception involves injuries that occur within government buildings. *See generally* R.C. § 2744.02(B)(4). Finally, exception 5 is inapplicable in this case since that exception involves civil liability being expressly imposed upon the political subdivision by a section of the Ohio Revised Code. *See generally* R.C. § 2744.02(B)(5). Accordingly, this Court finds Defendant City of Columbus is immune under R.C. § 2744.02(A)(1) from Plaintiff Davis' negligence claim. Accordingly, Defendants' motion for summary judgment is **GRANTED** with respect to the state law claim against Defendant City of Columbus.

### 6. *Claims Against Defendants in their Official Capacities*

This Court last turns to Defendants' argument that Plaintiff Davis' claims against them in their official capacities are duplicative of the claims she has already asserted against the City of Columbus itself. Plaintiff Davis does not respond to this argument. A lawsuit against a state official in his or her official capacity is deemed a lawsuit against the official's office. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989). Courts within the Sixth Circuit routinely dismiss official-capacity claims against municipal officials that are duplicative of claims asserted by the plaintiff against the municipal entity itself. *See Rideout v. Shelby Twp.*, 2023 WL 5917392, at * 6 (E.D. Mich. Sep. 11, 2023) (summarizing cases). While this Court has already granted summary

judgment with respect to claims against Defendants John and Jane Doe Nos. 1-15 and Quinlan, and claims against Officer Davis were previously dismissed, the Court nonetheless **GRANTS** summary judgment with respect to all official capacity claims against the individual Defendants as duplicative of the claims against the City of Columbus.

## IV.    CONCLUSION

For the reasons set forth above, Defendants' objections to findings 1, 2, and 4 within Plaintiff's expert's report (ECF No. 51 at PageID 980-982) are **SUSTAINED**. Additionally, Defendants' Motion for Summary Judgment (ECF No. 37) is **GRANTED IN PART and DENIED IN PART**. Specifically, summary judgment is **GRANTED** with respect to all claims against Defendants John and Jane Does Nos. 1-15; all claims against Defendant Quinlan; the First Amendment *Monell* claim against Defendant City of Columbus; the state law claim against Defendant City of Columbus; and all claims against Defendants in their official capacities. Summary judgment is **DENIED** with respect to the Fourth Amendment *Monell* claim against Defendant City of Columbus, which is the only remaining claim in this case.

**IT IS SO ORDERED.**

_____
**ALGENON L. MARBLEY**
**CHIEF UNITED STATES DISTRICT JUDGE**

**DATED: January 10, 2024**

44